UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

WELLS FARGO BANK, N.A.,

        Plaintiff,

v.                                                   Case No. 6:16-cv-1572-Orl-37KRS

MISION CRISTIANA BETHESDA, INC.
a/k/a BETHESDA CHRISTIAN
MISSION, INC.; PEDRO J. TORRES;
JUAN TOLEDO; MOISES RODRIGUEZ;
DIONICIA RODRIGUEZ; ELMER
IRIZARRY; MYRNA TORRES LADOW;
and GWENDOLYN C. LOPEZ,

        Defendants.

## AMENDED ORDER[1]

This matter is before the Court on: (1) Well Fargo's Motion to Enforce Settlement and Incorporated Memorandum of Law (Doc. 33), filed February 13, 2017; and (2) Defendants', Torres, Toledo, & Ladow, Response and Incorporated Memorandum of Law in Opposition to Wells Fargo's Motion to Enforce Settlement (Doc. 34), filed February 27, 2017. For the reasons set forth below, the motion is due to be denied.

## I.     BACKGROUND

This matter arises from an ongoing feud between Defendants—Pedro Torres ("**Torres**"), Juan Toledo ("**Toledo**"), Moises Rodriguez ("**M.R.**"), Dionicia Rodriguez

---

[1] Upon review, the Court finds that the Order entered on April 25, 2017 (Doc. 54) is due to be vacated due to a scrivener's error in the decretal section of the Order and replaced with this Amended Order.

("**D.R.**"), Elmer Irizarry ("**Irizarry**"), Myrna Ladow ("**Ladow**"), and Gwendolyn Lopez ("**Lopez**")[2]—concerning control of Mision Cristiana Bethesda, Inc. ("**Bethesda**") and the funds ("**Bethesda Funds**") that Bethesda has on deposit at Plaintiff Wells Fargo Bank, N.A. ("**Wells Fargo**"). (*See* Doc. 3 ("**Complaint**").)

According to the allegations of the Complaint, Bethesda maintains a Business Yield Saving Account and two Business Choice Checking Accounts ("**Bethesda Accounts**") with Wells Fargo. (Doc. 3, ¶ 12.) On **April 28, 2016**, Irizarry, D.R., and M.R. ("**Irizarry Parties**") visited a Wells Fargo located in Deltona, Florida ("**WF Branch**"), and requested modification of the list of authorized signers on the Bethesda Accounts. (*Id.* ¶ 14.) Specifically, they requested that Wells Fargo: (1) retain D.R. and M.R. as signers; (2) remove Lopez and Toledo; and (3) add Irizarry ("**Irizarry Requests**"). (*Id.*). The Irizarry Parties presented the banker with a letter stating that M. R. had full authority to make the Irizarry Requests ("**First Irizarry Letter**"). (*Id.*).

On or about **May 2, 2016**, a different group of "**Individuals**" visited the WF Branch, and requested that Wells Fargo add Toledo, Torres and Ladow ("**Ladow Parties**") as signers on the Bethesda Accounts, but remove the Irizarry Parties ("**First Ladow Requests**"). (*Id.* ¶ 15.) The Individuals supported the First Ladow Requests by providing Wells Fargo with handwritten minutes dated **April 28, 2016** ("**Minutes**") which reflected the purported decision of the Bethesda Board of Directors ("**Bethesda Board**") to: (1) remove M.R. from the Bethesda Board and from his positions as Secretary

---

[2] On **October 31, 2016**, Wells Fargo voluntarily dismissed Defendant Lopez as a party to this suit. (Doc. 9.)

and Treasurer of the "corporation" due to his "criminal record"; (2) accept Ladow as a new member of Bethesda and nominate her as the new Corporate Secretary; and (3) suspend the Bethesda Accounts until the election of new Bethesda Board members. (*Id.*) Wells Fargo also received a letter signed by the Irizarry Parties, claiming that a unanimous decision had been made for Bethesda to break away from another corporation as of **May 1, 2016** ("**Second Irizarry Letter**").(*Id.* ¶ 16.) Given the contradictory documentation and requests presented by the Irizarry Parties and Ladow Parties respectively ("**Conflict**"), Wells Fargo "restrained" the Bethesda Funds—which totaled $88,111.88. (*Id.* ¶ 20.)

In **May 2016**, Wells Fargo received correspondence signed by the Ladow Parties, which requested that Wells Fargo unfreeze the Bethesda Accounts ("**Second Ladow Request**"). (*Id.* ¶ 17.) Because the Conflict was unresolved and it faced conflicting claims for access to the Bethesda Funds, Wells Fargo refused the Second Ladow Request and kept the Bethesda Accounts frozen. About three months later, all Defendants, except Ladow, became litigants to a suit in state court wherein the parties dispute who are members and/or elected officials of Bethesda and who has the right to control the Bethesda Accounts. *See Bertilia Aguilar, et al v. Mision Christiana Bethesda Church Inc., et al*, Case No. 2016-11317-CDL (Fla 7th Cir. Ct. 2016) ("**State Action**"). Wells Fargo then filed the instant interpleader action against Defendants—the Irizarry Parties, the Ladow Parties, Bethesda, and Lopez—seeking a Court order allowing Wells Fargo to deposit the Bethesda Funds into the Court registry and requiring that Defendants settle or litigate their respective legal claims and rights to the Bethesda Funds. (Doc. 1.)

Following early settlement negotiations between all of the parties' attorneys ("**Attorneys**"), in **January 2017**, each Defendants' counsel allegedly agreed to allow Wells Fargo to deposit the Bethesda Funds into the trust account ("**Trust Account**") of Bethesda's attorney—Jesus Irizarry ("**Bethesda's Attorney**"). (Doc. 33-1, p. 2.) Wells Fargo's attorney—Seth Burack ("**WF's Attorney**")—then circulated a proposed settlement agreement to Defendants' counsel on **January 17, 2017** ("**First Draft**"), which memorialized the parties' agreement concerning deposit of the Bethesda Funds into the Trust Account ("**Deposit Provision**") and further provided that Wells Fargo would close the Bethesda Accounts after it deposited the Bethesda Funds into the Trust Account ("**Closure Provision**"). (*See id.* at 3–15; *see* Doc. 33, ¶ 11.)

Two days later, the parties held a global conference call ("**Conference Call**") to discuss the terms of the First Draft. (Doc. 33, ¶ 11.) Shortly before the Conference Call, counsel for the Ladow Parties—Herbert Zischkau, III ("**Ladow Parties' Attorney**"), revisions to the First Draft ("**Ladow Draft**"), which included a new provision ("**Records Provision**"), which would require that Wells Fargo deliver, "to each of the attorneys of record in the [State] Action, . . . both hard copy and readable digital formats" of certain bank records prior to closing the Bethesda Accounts. (*See id.* at 8.)

On **January 27, 2017**, WF's Attorney emailed ("**WF's Email**") another draft agreement ("**Final Draft**"), which contained all of the mutually acceptable changes to the First Draft that were discussed during the Conference Call save the Records Provision. (Doc. 33-6, pp. 5–20). Although the Records Provision was omitted, the Final Draft provided that Wells Fargo would only deliver hard copies of the bank records to the law

firm for Bethesda's Attorney ("**Irizarry Firm**") prior to closing the Bethesda Accounts ("**Limited Records Provision**"). (*See id.* at 12).

Because none of the parties responded to WF's Email or commented on the Final Draft, on **February 1, 2017**, WF's Attorney warned Defendants: "[i]f I do not hear anything by this afternoon, I will assume the [Final Draft] is acceptable to everyone in its current state and circulate a clean copy for everyone[] . . . to sign." Later that day: (1) Bethesda's Attorney verbally agreed to the Final Draft on behalf of Bethesda; and (2) the attorney for the Irizarry Parties also allegedly approved the Final Draft. Although the Ladow Parties' Attorney had not responded, WF's Attorney: (1) assumed he was in agreement; (2) circulated a clean version of the Final Draft; and (3) requested that the Attorneys have their respective clients sign the Final Draft by **February 8, 2017** ("**Signature Request**"). (Doc. 33-6, pp. 3, 7–20.) On **February 8, 2017**, the Final Draft was not yet signed by all of the parties, and WF's Attorney again emailed each counsel concerning the matter. (*See* Doc. 33-9, pp. 2–3.) On **February 10, 2017**, the Ladow Parties' Attorney advised that his clients would not execute the Final Draft because it did not include Records Provision. (*See* Doc. 33-11, p. 2).

Despite the Ladow Parties' refusal to execute the Final Draft, Wells Fargo maintains that the parties reached a global settlement agreement that the Court should enforce by granting Wells Fargo's Motion to Enforce Settlement ("**Motion**"). (*See* Doc. 33.) The Ladow Parties oppose the Motion (Doc. 34 ("**Response**")), and the matter is now ripe for the Court's consideration.

## II. LEGAL STANDARDS

Federal district courts have the inherent power to summarily enforce settlement agreements entered into by litigants in a pending case. *Ford v. Citizens & S. Nat'l Bank*, 928 F.2d 1118, 1121 (11th Cir. 1991). "The determination as to whether a binding settlement agreement was reached by the parties is governed by Florida contract law principles." *H&R Block E. Enters., Inc. v. Perkins*, No. 1:06-cv-93-SPM/WCS, 2007 WL 1020118, at *7 (N.D. Fla. Mar. 30, 2007). Under such principles, settlement agreements "are favored as a means to conserve judicial resources [,] [and] [c]ourts will enforce them when it is possible to do so." *See Spiegel v. H. Allen Holmes, Inc.*, 834 So. 2d 295, 297 (Fla. 4th DCA 2002).

Courts will not enforce an unsigned settlement agreement unless the party seeking to compel enforcement of such agreement demonstrates two things—(1) first, "that [the opposing party's] attorney had clear and unequivocal authority to enter into the settlement agreement," *Murchison v. Grand Cypress Hotel Corp.*, 13 F.3d 1483, 1485 (11th Cir. 1994); and (2) second, that the opposing party assented to all the essential terms of the agreement, *Spiegel*, 834 So. 2d at 297. In assessing whether the proponent of the unsigned agreement has made the requisite showing, courts use an objective standard under which "[t]he making of a contract depends . . . not on the parties having meant the same thing but on their having said the same thing." *See Specialty Disease Mgmt. Servs., Inc. v. Aids Healthcare Found.*, No. 3:01-cv-1353-J-32TEM, 2003 WL 25608009, *4 (M.D. Fla. Oct. 21, 2003).

### III. DISCUSSION

Wells Fargo claims that the Final Draft is valid and enforceable against the Ladow Parties because their attorney "agreed to all of the essential terms." (Doc. 33, ¶ 3.) Noting that the Third Draft is unsigned and omits the Records Provision, the Ladow Parties counter that no settlement agreement was ever reached. Upon review of the evidentiary record, the Court agrees with the Ladow Parties.

Under Florida law, courts will not enforce a settlement agreement unless its terms are "sufficiently specific and mutually agreed upon as to every essential element." *See Spiegel*, 834 So. 2d at 297 (citing *Don L. Tullis and Assoc., Inc. v. Benge*, 473 So. 2d 1384, 1386 (Fla. 1st DCA 1985)). "Uncertainty as to nonessential terms or small items will not preclude enforcement of a settlement agreement." *Id.* (citation omitted). However, competent substantial evidence must support a finding of a meeting of the minds between the parties. *See BP Prods. N. Am., Inc. v. Oakridge at Winegard, Inc.*, 469 F.Supp.2d 1128, 1132 (M.D. Fla. 2007) (citing *Long Term Mgmt., Inc. v. Univ. Nursing Ctr., Inc.*, 704 So. 2d 669, 673 (Fla. 1st DCA 1997)).

"'Where it appears that the parties are continuing to negotiate as to essential terms of an agreement, there can be no meeting of the minds.'" *Midtown Realty, Inc. v. Hussain*, 712 So. 2d 1249, 1251–52 (Fla. 3d DCA 1998) (quoting *Cent. Props., Inc. v. Robbinson*, 450 So. 2d 277, 280 (Fla. 1st DCA 1984)). This is so because:

> Preliminary negotiations or tentative and incomplete agreements will not establish a sufficient meeting of the minds to create an enforceable settlement agreement. Nor may an agreement be determined to be final where the record establishes that it is the intent of the parties that further action

be taken prior to the completion of a binding agreement." *Williams v. Ingram*, 605 So. 2d 890, 893 (Fla. 1st DCA 1992); *see Club Eden Roc, Inc. v. Tripmasters, Inc.*, 471 So. 2d 1322, 1324 (Fla. 3d DCA 1985) (explaining that "[w]here the parties intend that there will be no binding contract until the negotiations are reduced to a formal writing, there is no contract until that time").

Here, Wells Fargo has failed to submit the "substantial evidence" necessary to establish a meeting of the minds between the parties concerning settlement of this action. Crucially, the record evidence indicates that the parties did not intend to create a binding contract until their negotiations were formally documented and fully executed.[3] Yet, it is undisputed that: (1) only the Irizarry Parties have signed the Final Draft; (2) Bethesda has not yet signed;[4] and (3) the Ladow Parties also have not signed. (*See* Doc. 33, ¶ 2.)

The record evidence also is insufficient to establish assent of the parties through their conduct and communications. Notably, the First Draft circulated to the parties by Wells Fargo is properly construed as an offer to settle on grounds that would allow Wells Fargo to, *inter alia*, close the Bethesda Accounts upon the transfer of the Bethesda Funds into the Trust Account ("**Initial Offer**"). The Ladow Draft, which was circulated in

---

[3] Indeed, Wells Fargo not only established the Signature Requirement, it made its own promise to deposit the Bethesda Funds into the Trust Account contingent on satisfaction of the Signature Requirement—providing for deposit "so long as (and *only after*) [] all the parties . . . . agree to *and* execute the . . . proposed []Agreement." (*See* Doc. 33-1, p. 2 (emphasis added); *see also* Doc. 33-9, p. 5 (stating that the goal was "to have all of the signatures by [February 13th] so [that Wells Fargo could] dismiss the federal court interpleader action").)

[4] Wells Fargo alleges that Irizarry has agreed to sign the Proposed Agreement on behalf of Bethesda. (Doc. 33, ¶ 2.)

- 8 -

response to the First Draft, essentially rejected the Initial Offer by making a counter-offer that added a new an essential term to the First Draft—the Records Provision ("**Counter-Offer**").[5] *See Ribich v. Evergreen Sales & Serv., Inc.*, 784 So. 2d 1201, 1202 (Fla. 2d DCA 2001) (explaining that a "counteroffer operates as a rejection of a preceding offer"). Wells Fargo then rejected the Counter-Offer by circulating its Final Draft, which unilaterally replaced the Records Provision with the Limited Records Provision.

Given this record, the Court cannot find that the parties reached an enforceable settlement agreement. *See Ribich*, 784 So. 2d at 1202 (explaining that an acceptance is effective to create a contract only if it is "absolute and unconditional," and "identical with the terms of the offer. . . . A counteroffer operates as a rejection of a preceding offer"). Rather, the parties were still in the midst of negotiating mutually agreeable terms for the settlement of this action. *See Tomlinson v. Landers*, No. 3:07-cv-1180-J-TEM, 2009 WL 1117399, *4 (M.D. Fla. 2009) (holding that a party's revision to the language of a proposed agreement was evidence that negotiations were ongoing and parties had not reached a settlement agreement). Thus, the Motion is due to be denied.

IV. **Conclusion**

Accordingly, it is **ORDERED AND ADJUDGED** that:

---

[5] The Ladow Parties included the Records Provision in the Second Draft because: (1) they need "digital documents that are searchable and have a pedigree, a chain of custody, that will enable them to be evidence admissible as business records in the [State] [A]ction" (*see* Doc. 34, ¶ 20); and (2) they have no assurance that such records be obtainable by a third-party subpoena after closure of the Bethesda Accounts (*see id.* ¶ 20). Given such concerns—and the fact that Wells Fargo modified rather than wholly ignored the Records Provision—the Court rejects Wells Fargo's cursory argument that the Records Provision was not an essential term.

(1) The Order entered April 25, 2017 (Doc. 54) is **VACATED**, and the Clerk is DIRECTED TO STRIKE the vacated order (Doc. 54) from the record.

(2) Motion to enforce Settlement and Incorporated Memorandum of Law (Doc. 33) is **DENIED**.

**DONE AND ORDERED** in Orlando, Florida, this day of April 25, 2017.



ROY B. DALTON JR.
United States District Judge

Copies to:

Counsel of Record